IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILLIAM F. HARVEY, by his power of attorney <br> GLENDA W. BROWN <br> 4466 Gilberts Beach Road <br> Tyner, NC 27980 <br><br>     Plaintiff <br><br> v. <br><br> AMY E. SYMONS <br> THE LAW OFFICE OF AMY E. SYMONS, LLC <br> d/b/a COLORADO PROBATE LAW <br> 3773 Cherry Creek North Drive <br> Ste. 600 <br> Denver, CO 80209 <br><br>     Defendant | Case No. 1:25-cv-00900 |

**DEFENDANT'S NOTICE,
RESPONSE TO MOTION FOR A TEMPORARY RESTRAINING ORDER, and
PETITION FOR *IN CAMERA REVIEW***

I.     NOTICE REGARDING TRO HEARING AND PERSONAL JURISDICTION

    1.     At 7:00 p.m. on April 1, 2025, this Court set a hearing for April 3, 2025 at 1:00 p.m. MDT/3:00 p.m. EDT on Plaintiff's emergency MOTION for temporary restraining order. I, Amy Symons, the undersigned Defendant, am planning on attending via telephone and currently plan on attending *pro se.*

    2.     Plaintiff's counsel, Ms. McClure, certifies that she served notice of the hearing on Mr. James Lillis. Attached at **Exhibit A** is Mr. Lillis' email to Ms. McClure explaining he does not have authority to accept service on my behalf.

    3.     Pursuant to Fed. R. Civ. P. 12(b)(2) this court does not have personal jurisdiction over me because I have not been personally served.

RECEIVED
APR 3 2025
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

4. Interestingly, Ms. McClure's tactics to serve me were "so aggressive" that one process server and private investigator who had been working in this field for more than 20 years, Mr. Andrew Cox of Trailfinder, Inc.[1] and who had previously been retained by Ms. McClure and then stopped working for her, called me at 4:20 p.m. on April 2, 2025, <u>to express concern for my safety</u> because Ms. McClure's behavior was so disconcerting he felt he was obligated to share his concerns with me.

5. Although defendant appreciates both the value of counsel and, as a transaction trusts and estates attorney in Colorado, that *pro se* clients often need handling with kid gloves, the necessity for a hasty response made it inopportune for Defendant to engage counsel to file an entry of appearance at this time.

6. This filing is an immediate Response to Plaintiff's Emergency Verified Motion for Temporary Restraining Order, in which Plaintiff moves for injunctive relief and a temporary restraining order including:

    a. to enjoin me from purporting to act on behalf of William F. Harvey;

    b. to enjoin me from speaking to Mr. Harvey and Ms. Brown;

    c. to enjoin me from interfering with Mr. Harvey's contractual and business relationships, whatever that may mean;

    d. to account for my actions during the last 100 days;[2]

    e. to fully cooperate with Mr. Harvey and Ms. Brown – through their counsel – to provide Mr. Harvey with access to his accounts; and

---

[1] This filing is being drafted within 24 hours of the scheduled hearing. I understand this statement is appropriately supported by an affidavit, Mr. Cox was traveling and unable to complete an affidavit by the hearing time. The court should treat this information as it sees fit.

[2] *N.B* – in my prayer for relief, I suggest since November 8, 2024 or about 150 days.

  f. to immediately return funds to Ms. Brown - who is an active bankrupt, who is unable to account to me for the $3,212.85 disparity in reimbursements she made to herself during a period no one disputes my authority as Agent, and who overdrew the one account of Mr. Harvey's to which she gained access within one week of such access.

7. As Plaintiff Ms. Brown states in her Memorandum in Support of Verified Motion for a Temporary Restraining Order, in seeking such a temporary restraining order the Court must apply the same standard that is applied to preliminary injunctions. *Lofton v. District of Columbia*, 7 F. Supp., 3d 117, 120 (D.D.C., 2013) (citing to Hall v. Johnson, 599 F. Supp. 2d 1, 3 n. 2 (D.D.C. 2009). Therein, Judge Walton explains that a plaintiff seeking a preliminary injunction must establish:

> [1] that [he or she] is likely to succeed on the merits;
> [2] that [he or she] is likely to suffer irreparable harm in the absence of preliminary relief,
> [3] that the balance of equities tips in [his or her] favor, and
> [4] that an injunction is in the public interest.

8. As discussed herein, the Plaintiff fails to meet every one of the requirements for a temporary restraining order.

II. <u>PLAINTIFF DOES NOT SATISFY THE REQUIREMENTS OF A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER</u>

**The Plaintiff is Unlikely to Succeed on the Merits**

9. Plaintiff's Complaint does not allege an amount in controversy that is greater than $75,000. The amount in controversy is $0.

10. The Plaintiff cannot succeed on the merits when this matter is wrongly before the federal court and lacks subject matter jurisdiction.

11. In Plaintiff's Complaint, she acknowledges that I had the authority to act under a Durable Power of Attorney dated November 9, 2016 ("2016 DPOA") and further acknowledges that I began acting in an agency capacity on or before September 26, 2024. See ¶¶ 14 and 27 of the Complaint.

12. In ¶ 56 of Plaintiff's Complaint, she alleges that I received notice of the revocation[3] of my authority under the 2016 DPOA on February 5, 2025.

13. To be certain, assuming that Mr. Harvey had contractual capacity when he signed Plaintiff's December 18, 2024 power of attorney and the instrument is valid, the first notice I received that the December 18, 2024 instrument revoked my authority as agent was on February 5, 2025. Until that time, I was acting within the scope of my authority as Mr. Harvey's agent under the 2016 DPOA.

14. Plaintiff alleges that the only transactions that transpired after February 5, 2025 were (i) on February 5, 2025, Ms. Brown and Mr. Harvey took two checks to PNC Bank to deposit them, see ¶85; and (ii) Mr. Harvey's PNC checking account was overdrawn between February 5-7, 2025, see ¶89.

15. In her complaint, Plaintiff does not allege that I took actions that harmed Mr. Harvey after February 5, 2025; however, Plaintiff alleges that Ms. Brown did.

16. The Complaint explains that Plaintiff Ms. Brown locked me out of Mr. Harvey's PNC checking account when Ms. Brown gained control of it on January 29, 2025, see ¶81, and that Ms. Brown overdrew the account only 7 days later on February 5, 2025, see ¶¶ 75 and 89.

---

[3] Such alleged revocation of my authority depends on the validity of the instrument that Mr. Harvey signed on December 18, 2024, which turns on Mr. Harvey's contractual capacity on December 18, 2024. A hearing to determine these issues is appropriate before a distribution of Mr. Harvey's assets to Ms. Brown or Mr. Harvey.

17. The Defendant is not liable for Plaintiff Ms. Brown's mismanagement of Mr. Harvey's PNC checking account. This mismanagement is the only transaction Plaintiff alleges transpired after I received notice of the supposed revocation of my authority as an Agent.

18. The amount in controversy is $0.

19. Alleging punitive damages of $1,000,000 when actual damages are $0 is unconstitutional. *Exxon Shipping Co. v. Baker,* 554 U.S. 471 (2008), *State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408 (2003). The amount in controversy is less than $75,000.

**Mr. Harvey is not at risk of suffering irreparable harm while I pay his expenses from an Agency account. He is, however, is at risk of suffering irreparable harm *if Plaintiff Glenda Brown*, who is currently in an active bankruptcy proceeding and has shown herself unable to account for transactions, is given access to his financial accounts.**

20. I have been responsibly managing the payment of Mr. Harvey's expenses since October, and there is no risk to Mr. Harvey of maintaining the status quo until there is a resolution of this matter. Alternatively, Ms. Brown's access of Mr. Harvey's accounts puts Mr. Harvey at risk of irreparable harm because (i) Ms. Brown is in active bankruptcy; (ii) Ms. Brown drafted the self-serving instrument that she put in front of Mr. Harvey on December 18, 2024, (iii) Ms. Brown is unable to account for reimbursements made to her in November and December 2024, and (iv) Ms. Brown overdrew Mr. Harvey's PNC account within a week of gaining control over that account.

21. <u>I request the court take judicial notice of Plaintiff Glenda W. Brown's open bankruptcy proceeding filed in the United States Bankruptcy Court of the Eastern District of North Carolina, Case 22-02912-5-JNC</u>.

22. Her Voluntary Petition for Individuals Filing for Bankruptcy ("Petition"), a copy of which is attached as **Exhibit B,** was filed on December 15, 2022. In the Petition, Ms. Brown

reported no non-retirement income and approximately $38,000 of assets, consisting of minimal liquid assets, vehicles, and her residence, which she valued at $5,000. She lists federal tax debt of $6,500 and consumer debt (primarily credit cards) of $118,485.

23. The Plaintiff Glenda Brown, the principal Mr. Harvey, and I all agree that Mr. Harvey signed a Durable Power of Attorney for Financial Management (the "2016 DPOA"). That power of attorney is attached as **Exhibit C.**

24. Although the Plaintiff fails to explain that I began acting under the 2016 DPOA because Mr. Harvey had stopped paying his bills and lost telephone service making it impossible for Ms. Brown or me to reach him by telephone or email. At ¶ 27 of the Complaint, Plaintiff explains that I was billing for my services as Mr. Harvey's attorney-in-fact on or before September 26, 2024.

25. As is expected of any Agent who starts acting under a power of attorney because of a principal's diminished capacity, with Mr. Harvey's and Ms. Brown's knowledge, consent, and affirmative action of each sending me a copy of Mr. Harvey's driver's license (I received two copies) that was required for me to open the agency account, I established an agency account in Colorado and began paying Mr. Harvey's expenses, including health care and liability insurance premiums, from his agency account.

26. In September, October, and November 2024, Ms. Brown and I worked together out of mutual concern for Mr. Harvey's growing forgetfulness and need for additional memory care services. During that time, I had no knowledge of Ms. Brown's history of financial mismanagement and genuinely believed Ms. Brown to be acting out of genuine concern for her cousin's well-being.

27. Ms. Brown incurred expenses between September and December 2024. She would ask Mr. Harvey to reimburse her and would provide me with receipts and other supporting documentation for these reimbursements.

28. Among my requests for communication to Ms. Brown, which Plaintiff now describes as "harassment" and "intimidation," is my request that Ms. Brown account for certain transactions. Specifically, she requested payment from Mr. Harvey in the amounts of $2,340 (Capital One check #2601 dated November 22, 2024), $945 (Capital One check #2602 dated December 4, 2024), and $1,000 (PNC check #4953 dated December 18, 2024). Although I can account for $1,072.15 of these reimbursements, I have repeatedly requested Ms. Brown reconcile the outstanding balance of $3,212.85 to no avail.

29. Mr. Harvey did his own estate planning throughout his lifetime. Although he had casual conversations with local counsel, Stephen Nealon, Mr. Nealon never drafted anything for Mr. Harvey, and Mr. Harvey only provided Mr. Nealon with a copy of his funeral instructions.

30. Mr. Harvey drafted the 2016 GPOA appointing me as his Agent. Attached at **Exhibit D** are emails from Mr. Harvey to me in 2013 and 2016 advising me of recent changes he made to his estate planning documents. In 2013 we discussed his desire to appoint me in fiduciary positions. I strongly objected to serving as his agent under a financial or healthcare power of attorney, but was persuaded to serve as his personal representative. In 2016, he did not bother giving me an opportunity to protest, he simply signed new powers of attorney and mailed and emailed copies to me.

31. Ms. Brown drafted the powers appointing herself as Mr. Harvey's Agent. See page 9 of the instrument dated December 18, 2024 – which Plaintiff relies on for her authority to access Mr. Harvey's accounts – that states "This document was prepared by: Glenda Brown."

7

32. In addition, neither Ms. Brown nor Mr. Harvey provided me with a copy of this instrument supposedly revoking my authority. Mr. Harvey never explained to me he executed such an instrument, and Ms. Brown took a month to inform me. It was not until February 5, 2025, that her lawyer sent me a copy of the instrument dated December 18, 2024.

33. In other words, prior to February 5, 2025, even if we assume Plaintiff's position that the December 18, 2024 is a valid power of attorney, I had no notice of the revocation of my authority under the 2016 DPOA.

34. Although in her complaint Plaintiff can only account for $3,600 in the PNC account, my accounting shows a balance of $6,597.96 on January 29, 2025, the day Ms. Brown acquired access over the account, and I lost access to the account.

35. As stated in her complaint, Ms. Brown overdrew this account around February 5-7, 2025. Within a week, Ms. Brown dissipated $6,600 of Mr. Harvey's assets even though I was paying all of Mr. Harvey's expenses from an agency account.

36. Ms. Brown does not have the requisite skill to manage Mr. Harvey's financial affairs. It is harmful to Mr. Harvey to suggest funds be released to Ms. Brown.

37. There are sufficient assets in the agency account for me to continue to pay expenses until this matter is appropriately resolved and, ideally, a professional fiduciary is appointed as a conservator for Mr. Harvey and can take over the payment of Mr. Harvey's expenses and management of his financial affairs in a manner that is both in Mr. Harvey's best interests and recognizes that any "ceasing and desisting" is a breach of fiduciary duties.

38. In stark and disturbing contrast, demanding that these funds be turned over to Ms. Brown will very likely result in the dissipation of Mr. Harvey's assets in exactly the manner

Ms. Brown dissipated $6,597.96 from Mr. Harvey's PNC account in one week's time, spending the money on anything but Mr. Harvey's expenses that are being paid from the agency account.

39.    As Plaintiff states in her complaint, her counsel sent me a "Cease and Desist Letter" on February 5, 2025. In that letter, she demands, among other things, that I "immediately cease and desist from taking any action of any kind or sort that involves Mr. Harvey's finances, health, and any action or decisions associated with either."

40.    This is an inappropriate demand of a fiduciary. Ironically, in his signed but unsworn and unacknowledged affidavit, Mr. Harvey fails to correctly explain what he did for 50 years as a career. He was a trust officer. He was a well-respected and very successful trust officer because of his profound understanding of his fiduciary responsibility to administer trusts for the benefit of beneficiaries. The Mr. Harvey that I worked with at Riggs Bank would never have approved a "cease and desist" letter to a trustee or agent acting under a financial power of attorney because of the inherent liability associated with demanding that a fiduciary immediately cease acting in such a capacity.

41.    Ms. McClure's letter, in contrast to anything Mr. Harvey would have sent to someone acting as an agent, provides no possibility for the transition of agency in a manner that enables Mr. Harvey's financial obligations and insurance to be timely and continuously paid.

42.    Ms. McClure's letter of February 3, 2025 – that she calls a cease-and-desist letter without any consideration of why such a title is problematic – fails to mention Mr. Harvey's "best interests" even once, and her demands suggest a breach of my fiduciary duty and a breach of Ms. Brown's supposed fiduciary duty.

43.    Any attorney or professional fiduciary with an understanding of the laws governing fiduciary relationships would have reasonably been alarmed by the lack of

acknowledgment in Ms. McClure's letter of Ms. Brown's and my legal obligations under any power of attorney, regardless of the underlying issue of which instrument is valid.

### The balance of equities dictates that the appropriate proceeding is not an immediate injunction but a petition for the appointment of conservator and guardian

44. I am currently paying Mr. Harvey's medical insurance premiums (pulled automatically from the agency account) each month. We recently paid Mr. Harvey's D.C. real property taxes. In the last 100 days, we paid his liability and property insurance premiums and his long-term care insurance premiums.

45. It makes no sense to order that I cease making those payments. That is not equitable or fair to Mr. Harvey and does not take Mr. Harvey's best interests into consideration.

46. Prior to Plaintiff deciding that the appropriate reaction to requests for communication and cooperation was to file a lawsuit in federal court, I had engaged James Lillis of Furey, Dooley & Abel in Bethesda, Maryland to assist me in responding to Ms. McClure's "cease-and-desist letter" demanding I breach my fiduciary authority.

47. From February 27, 2025 through March 20, 2025, Mr. Lillis tried to communicate with Ms. McClure via telephone calls. From January 17, 2025 until March 6, 2025, I tried to communicate with Ms. Brown through texts and phone calls.

48. Mr. Lillis and I were naïve in thinking that cooperation and communication could facilitate this process. Ms. McClure was unwilling to speak with Mr. Lillis via telephone and Ms. Brown was unwilling to text or speak with me.

49. Mr. Lillis' letter to Ms. McClure dated March 20, 2025 is attached as **Exhibit E**.

50. Mr. Lillis's letter summarizes the relevant history and facts and explains what he and I believed the balance of equities dictate – that the parties work together to appoint a professional fiduciary to manage Mr. Harvey's financial affairs.

51. Mr. Lillis' letter and Plaintiff's Complaint are evidence that Ms. McClure and Ms. Brown have no interest in communication and cooperation, their sole interest is for the bankrupt Ms. Brown to gain immediate access to Mr. Harvey's assets.

52. Plaintiff's suggestions are not equitable.

**An injunction is neither in the public interest nor in Mr. Harvey's best interests**

53. This is a matter that should be addressed in a court that has jurisdiction over the appointment of a conservator.

54. Regardless of where this matter is tried, the court, the parties, the lawyers involved, and Mr. Harvey's attending healthcare providers all have professional obligations to protect vulnerable persons from elder abuse and financial exploitation.

55. Diminished capacity matters are difficult. They are made more difficult by bad actors. Diminished capacity is a gray area that requires the presentation of facts and evidence. The changed behaviors and inexplicable anger of an elderly person toward a trusted confidant of two dozen years, as well as efforts to isolate that elderly person, may be relevant evidence in a proceeding for appointment of a conservator and guardian.

56. Plaintiff Mr. Harvey is a member of the public. We should be acting in his best interests. It is not for the public good to order his assets at risk of dissipation.

III.    THE ISSUE OF CAPACITY

57. Central to this controversy is the financial exploitation of an elderly and vulnerable person.

58. Plaintiff submitted a letter from Dr. Guillermo Portillo explaining that Mr. Harvey is suffering from Mild Cognitive Disorder. He goes on to say, "Mr. Harvey does not lack the capacity to make decisions related to his property, finances, assets and healthcare" and "Mr.

11

Harvey does not currently lack the capacity to revoke or designate any person of his choice as his durable power of attorney."

59.Mr. Harvey, however, does not have the capacity to file lawsuits on his own behalf. The complaint is signed and filed solely by Glenda W. Brown as "power of attorney for/for the benefit of William F. Harvey."

60.In his affidavit, Mr. Harvey states "I graduated from the University of Virginia with a law degree. For most of my professional career, I provided financial planning services on behalf of Riggs Bank . . . "

61.Mr. Harvey's legal career as a fiduciary is relevant to this proceeding as is his capacity to relay facts accurately, so nuances of what he did for 50 years matter.

62.Although Mr. Harvey indeed received his J.D. from UVA in or around 1967, I have never heard him describe his job as "providing financial planning services." Indeed, I think such a description would be insulting to the man I knew 25 years ago.

63.I met Mr. Harvey in 2000, while I was working in the trust department of Riggs Bank during the summer between my first and second year at The George Washington University Law School.

64.For more than 50 years, Mr. Harvey worked as a trust officer – those fiduciaries who were the primary point of contact for beneficiaries and had the responsibility of administering the trust and making distributions in accordance with the terms of the trust instrument, the law, and the trustee's fiduciary obligations. Although Mr. Harvey worked closely with the investment management team – and had strong opinions when they made decisions about which he did not agree – Mr. Harvey's title was always that of Trust Officer.

65. After law school, I worked in private practice as an associate at Ross, Marsh, and Foster, a boutique trust and estate firm at 2001 L Street, N.W. in Washington, D.C.

66. Riggs Bank and one of the partners at Ross, Marsh, and Foster were designated as co-personal representatives on several large estates. Mr. Harvey and I spoke frequently as we worked together administering these large estates.

67. I knew Mr. Harvey to be fastidious and very knowledgeable about legal issues concerning fiduciaries, probate and trust administration, and federal gift and estate taxation.

68. I knew Mr. Harvey to be formidable and well respected. I was close with Mr. Harvey when Riggs Bank was acquired by PNC in a bit of a scandal. After the acquisition, it was Mr. Harvey's deserved reputation and impressive client list that enabled him to negotiate an excellent employment agreement with Sandy Spring Bank, where he started working as a trust officer in or around 2006 or 2007 and brought sizeable trust assets with him.

69. Whether Mr. Harvey is able to recall the details of his impressive career in the way a mentee is able to do may not be relevant to his capacity to manage his financial affairs, but one hopes it humanizes this dear man who could be any one of us.

70. What is extremely relevant is that Mr. Harvey the trust officer and UVA graduate knew how to revoke a power of attorney. Plaintiff never alleges that Mr. Harvey provided me written notice of his revocation of my authority under the 2016 DPOA. Indeed, he never did.

71. My holding Mr. Harvey to this legal standard is relevant and reasonable.

72. I spoke to Mr. Harvey frequently between October 9, 2024 and January 29, 2025, after spending long days with him during my trip to D.C. from October 9 through 12, 2024, I estimate I spent more than 25 collective hours on the phone with him after leaving D.C. through January 29, 2025.

73. Not once during that time did he mention to me that he signed a new power of attorney. On January 18, 2025, I asked Mr. Harvey whether he signed a new power of attorney on December 18, 2024 and he had no recollection of doing so. Through January 29, 2025, he continued to have conversations with me suggesting he believed I was acting as his agent.

74. On or around January 29, 2025, Ms. Brown descended upon Washington, D.C. and camped out there (presumably on Mr. Harvey's dime) until on or about February 10, 2025, staying long enough that she ensured her cousin with diminished capacity was manipulated to the point of never wanting to speak to me again because he believed I was stealing from him.

75. Somehow, this gentleman that Plaintiff alleges presently has, and as always had, capacity to make decisions related to his property, finances, assets, and healthcare, and who had a 50-year career "providing financial services," has suddenly decided it is astute and imperative that his financially bankrupt cousin, whom he never designated in a fiduciary capacity in 50 years of drafting his own estate plan, should now have access to his financial accounts.

76. I believe that the explanation lies in Ms. Brown's financial exploitation, isolation, and manipulation of an elderly and vulnerable person that amounts to elder abuse.

IV. <u>DEFENDANT'S PETITION FOR IN CAMERA REVIEW</u>

77. I am aware of my duty to account as an agent. Up until and on January 29, 2025, I accounted to Mr. Harvey directly by going through his income and expenses with him on a very regular basis.

78. During that time, I understood that much of the information I provided Mr. Harvey was forgotten by the following day, so I made an effort to relay information to him frequently.

79. Email was not an option. I flew out to D.C. in October 2024 because Mr. Harvey had failed to pay his telephone bills, and his mobile and landline telephone and internet services were all disconnected. Although we were able to reconnect his phone lines, Mr. Harvey never reconnected his internet nor activated his email account.

80. In addition, as Plaintiff alleges, I tried to forward Mr. Harvey's mail to my address and, had I been successful, this would have defeated my snail-mailing the accounting to Mr. Harvey.

81. After Ms. Brown failed to take Mr. Harvey to a physician on November 22, 2024, as previously agreed and scheduled, I became concerned with her access to his financial information and did not mail accountings directly to him because I knew she was traveling to D.C. with more frequency, and I could not regulate his access to his mail.

82. I would like to provide the court with the following for *in camera* review:

    a. An accounting and supporting bank statements for the agency account since it was opened on November 8, 2024 through the most recent bank statement dated March 11, 2025; and

    b. An inventory of all of Mr. Harvey's assets.

83. I believe that *in camera* review is appropriate because:

    a. I have grave concerns about Ms. Brown's lack of financial management skills and recent mismanagement of her and Mr. Harvey's assets. My strong preference is to limit her access to information about Mr. Harvey's accounts and obligations.

    b. I have grave concerns about Ms. McClure, specifically, despite her knowledge of Ms. Brown's active bankruptcy and receipt of the historical

15

     information provided in Mr. Lillis' letter dated March 20, 2025, she refused to communicate with my counsel, directed her client to refuse to communicate with me, and proceeded with aggressive litigation tactics. I have no reason to believe she will be any more responsible with Mr. Harvey's financial information than Ms. Brown would be.

  c. Plaintiff alleges that Mr. Harvey has capacity to manage his financial affairs. Accordingly, he should be able to disclose all the information that I provide to the court in my inventory of his assets. My preference is that in a proceeding regarding Mr. Harvey's capacity to manage his financial affairs, Mr. Harvey be permitted to provide his own evidence regarding his finances rather than rely on my answers.

V. **PRAYER FOR RELIEF**

WHEREFORE, Defendant respectfully requests that this Court:

 1. Deny Plaintiff's Motion for a temporary restraining order;

 2. Deny any request giving Ms. Brown immediate access to Mr. Harvey's assets;

 3. Order Ms. Symons to deliver an accounting and inventory to this Court for *in camera* review;

 4. Upon determining that there has been no misappropriation of funds from the agency account and that all of Mr. Harvey's obligations are being paid from the agency account and that there are sufficient assets for Ms. Symons to continue paying Mr. Harvey's expenses from the Agency account, issue a temporary restraining order valid until adjudication of the validity of both powers of attorney and, if appropriate, the appointment of a conservator,

16

restricting anyone's access to Mr. Harvey's accounts with the exception of Ms. Symons' access to the agency account and duty to account *in camera* to this court quarterly; and

     5.     Dismiss this matter for lack of subject matter jurisdiction and order the parties to file a petition for appointment of conservator and guardian for Mr. Harvey in the probate division of the D.C. Superior Court.

Respectfully submitted April 3, 2025,

*/s/ Amy E. Symons*
Amy E. Symons, Defendant, *Pro Se*